### PRICE v. ATLANTIC COAST LINE R. CO.
#### No. C. A. 3043.

United States District Court,
E. D. South Carolina,
Florence Division.
Oct. 8, 1953.

---

1. 2 Beale on Conflict of Laws 1304 is to the same effect.

James P. Mozingo, III, Darlington, S. C., for plaintiff.

Willcox, Hardee, Houck & Palmer, Florence, S. C., for defendant.

WYCHE, Chief Judge.

This is an action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for damages resulting from the death of Clyde McLeod, a section master, employed by the defendant.

It was tried before me without a jury and upon agreement to submit the case to me for decision upon the entire record, including interrogatories, the depositions taken respectively by plaintiff and defendant, and the testimony taken at a trial in May, 1952, which had resulted in a mistrial; the understanding being that the answers to the interrogatories should be considered as testimony that would be offered respectively by the plaintiff and the defendant.

The complaint alleges: That the deceased was employed by the defendant railroad as a section master working out of Mars Bluff, South Carolina; that on or about March 31, 1951, the deceased was ordered by his superiors, all agents, servants and employees of the defendant, to put out a fire on the right of way of the defendant; that the deceased was ordered to do this without proper help and without proper equipment; that the deceased went to the scene of the fire with two of his section hands, and there assisted them in extinguishing the fire, returned home in a weakened and sickly condition and lapsed into unconsciousness the night of March 31, 1951, and died on April 1, 1951, as a result of a cerebral hemorrhage that was caused by the negligence of the defendant.

The answer admits that: The defendant was engaged in interstate commerce; that the deceased was employed by the defendant as section master; that he went to the scene of the fire on the date alleged; and in a small way assisted in extinguishing the fire; that he became unconscious on the night of March 31, 1951, and died on April 1, 1951; and then alleges that his work was in a supervisory capacity and he was not required to do manual labor, particularly was he not required to do anything which he was unable physically to perform; that if defendant were negligent in any of the particulars referred to in the complaint, which are specifically denied, the negligence of the deceased in fighting a fire or attempting to fight a fire, when he was not required or it was not necessary for him to do so, and when he was suffering from high blood pressure, or a disease which, upon exertion, might bring on a cerebral hemorrhage, combined and concurred with the alleged negligence of the defendant as a contributing and as a proximate cause of deceased's alleged injuries, if any, without which they would not have occurred.

In compliance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.

C.A., I find the facts specially and state my conclusions of law thereon, in the above cause, as follows:

### Findings of Fact

The deceased had been an employee of the defendant since January, 1918; at the time of his death on April 1, 1951, he was employed as a section master for the defendant at Mars Bluff, South Carolina; his section gang normally consisted of five or six men.

While the deceased and his crew were regularly assigned to the Mars Bluff section, they were also required to help in the Pee Dee section in pulling and moving track; the Pee Dee section was required to help in the Mars Bluff section, but the right of way of the Mars Bluff section had not been burned off or cleared of grass, weeds and bushes, during the fall of 1950, or the early part of 1951, prior to the fire.

The fire started, it may be reasonably assumed, from cinders falling on the defendant's right of way from defendant's Extra Steam Engines Numbers 1800 and 1806, the first passing the scene of the fire at 12:11 o'clock p. m., and the other passing at 12:49 o'clock p. m.

Section 1070 of the Rule Book of the defendant referring to the duties of section masters, provides: "They will remove all combustible material from the company line and in vicinity of track and not permit rubbish to accumulate near bridges and buildings and will promptly extinguish any fire that may occur along the line of the road."

Section 1060 of the Rule Book of the defendant provides: "They are required to direct the labor of their hands and are expected to engage personally in all work necessary to keep their section in proper order."

About 1:30 o'clock p. m., on March 31, 1951, one McCrary, a Signal Maintainer, employed in another department of the defendant, and not a superior to the deceased, while making his regular inspection of signals, saw a small fire on defendant's right of way in Polk swamp, about a mile from Mars Bluff, "burning real slow, direct straight across from the track"; continuing on his regular round, checking wires, when he reached Mars Bluff at about 1:45 o'clock p. m. he saw the deceased with his men and stopped and reported the fire to the deceased.

At the time the fire was reported to the deceased, only two, Frank James and Arthur James, of the five or six men normally making up his crew were working; the defendant did not normally permit its employees to work over forty hours per week; if occasionally the men worked overtime, they "had to make up for it by losing time"; that is, the defendant "would give them time off for the overtime".

Egerton, one of the decedent's crew, had made his time at twelve o'clock noon on the day of the fire and was released from duty at that time, but he saw the fire later and was about two hundred yards from the decedent when the fire was reported to the deceased, and would have gone with the decedent and helped put out the fire if decedent had requested him to do so.

After the fire had been reported to the decedent he left by his motor car with the two James employees to put out the fire. When he arrived at the fire, he put Arthur James out at the fire and told him to put it out while he and the other James employee went to the next crossing to turn the motor car around. In the meantime the wind "got up" and when he got back to the fire he put Frank James off to help fight the fire and he went back to Mars Bluff to park the motor car on a siding and then "walked and ran" back to the fire. When he came back to Mars Bluff with the motor car one of his crew, Egerton, whose time was up, was still there and would have gone back with him and helped put out the fire if the decedent had asked him to do so. When he got back to the fire Frank and Arthur James had the fire under control and were putting out little blazes that would "catch up a little ways". There was no reason for the decedent to help fight the fire when he got back because the two laborers had it un-

der control, but he took a little pine top brush and went behind the James employees and when a little fire would blaze up he knocked it out with the pine top brush or "stomped" it with his feet. He helped the laborers in this manner for about ten minutes.

There is a trestle between the station at Mars Bluff and where the fire was being fought. The fire burned within a short distance of the trestle and burned over approximately one acre before it was completely extinguished. Pine tops were cut and used in successfully putting out the fire; while the section gang was equipped with shovels, they were not used in extinguishing the fire.

Under the defendant's rules and practices, it is the section master's duty to help put out fires if his men do not have it under control or if it appears that the fire may burn adjoining property.

After the fire had been put out, McCrary met the decedent and the two laborers walking on the railroad toward Mars Bluff and he picked them up and brought them to Mars Bluff on his motor car about 3:20 p. m., or about an hour and half after McCrary had reported the fire to decedent. On the way back to Mars Bluff, after the fire had been extinguished, decedent, "picked at", "deviled and pinched" McCrary and engaged in other playful banterings, indicating that decedent was then in good spirits, and when McCrary left he gave him the "high sign".

When the deceased went to the fire, he appeared his usual self. There was nothing obviously wrong with him and he seemed all right to those who observed him. When McCrary informed him of the fire, he mischievously picked up a small rotten stick and threw it at him and said that he did not think he was going to the fire.

After the fire and when he got off of McCrary's motor car at Mars Bluff and after McCrary had left, he went by the station and asked one Sitton, the freight agent at Mars Bluff, if he would go to Dillon, South Carolina, a distance of approximately twenty-five miles, with him the next day to a mutual friend's funeral. At that time Sitton noticed that his face was flushed and his clothes were smooty, looked like brush rubs on his overalls. After putting up his tools, he went off duty at four o'clock. At about 5:30 p. m. he had a conversation with one Frank Price in which he said he was sick and had gotten too hot fighting a fire. About 7:10 p. m. he saw one of his crew, one Williams, at Price's Store and told him he wanted him to go to work the following Monday morning. Later that night at around 7:30 the freight agent saw decedent again at Price's Store where the decedent asked him "Is that mail train running?" The freight agent replied, "Yes, Mr. Mac, the mail train is gone—the 375 is passing there now". The decedent then said, "Have I been sitting here all this time?" His face was flushed and "he kind of acted like he was dazed or something". Shortly thereafter he left the store, got in his car and drove home. There is no testimony about his further activities until ten o'clock p. m. when he became restless shortly after retiring; he then complained of a severe headache and began noisy breathing and then was unable to be aroused; at 10:30 p. m. that night, his personal physician Dr. E. M. Hicks was called and upon his arrival he found the deceased to be cyanosed, with stertorous breathing, which indicated that he had had some collapse or was in shock. His pulse was very irregular; his eyes deviated, one pupil larger than the other and he was unconscious. His blood pressure was at that time 185 over 115. He was taken to the hospital about 11:30 p. m. in an ambulance and died at 7:15 o'clock on the morning of April 1st. Upon his arrival at the hospital at 11:35 p. m., he was examined and treated by Dr. Mead. Dr. Mead's examination disclosed that he was cyanotic; that his breathing was stertorous; he was nauseated; he was in a deep coma; the pupil of one of his eyes was dilated and fixed, that is, it would not react to light; his neck was stiff; all of his extremeties

were paralyzed; his blood pressure was 185 over 115.

The deceased was fifty-two years old at the time of his death and had been suffering from high blood pressure for three years, during which time he had been under the care of his personal physician Dr. Hicks, who had told him to guard against exercise or exertion. His doctor had him on active medical treatment and a restricted diet in order to reduce his weight.

It was the opinion of Dr. Mead and Dr. Hicks, his two attending physicians, that he died of a massive cerebral hemorrhage. Exertion is a producing cause of cerebral hemorrhage. Cerebral hemorrhages occur very commonly during excessive emotional strain, violent physical effort, but almost as often occur without any preceding excitement or exertion. They often occur while the patient is in bed. A hemorrhage is a dangerous thing and results from a combination of two conditions, high blood pressure and weakening of the blood vessels, which predominates at any time is hard to say. Blood pressure elevation as a result of exertion would in a short time go back to its previous elevation and the patient would have no symptoms in the interim. If a cerebral hemorrhage is produced by unusual strain or emotional stress, it would more likely occur at the time of the maximum physical exertion and emotional strain. Usually a doctor would not anticipate a hemorrhage occurring at ten o'clock at night following exertion sometime prior to three o'clock that afternoon. A doctor would expect each hour to lessen the blood pressure so that the probability of the hemorrhage would be lessened, but there would be no way of being absolutely sure, unless the blood pressure had been followed from hour to hour in the afternoon. The deceased vomited considerably which is terrible exertion and sometime doctors see apoplexy and cerebral hemorrhage following vomiting. Vomiting is associated with cerebral hemorrhage.

It was the opinion of Dr. Hicks, that it was possible that the exertion of fighting the fire might have been one of the causes, or producing causes, of decedent's death. It was the opinion of Dr. Mead and Dr. Hicks, the deceased's two attending physicians, that the exertion of the deceased in assisting to extinguish the fire, did not cause the cerebral hemorrhage nor did it contribute to the death of the decedent. It was the opinion of Dr. McLendon, who testified hypothetically for the plaintiff, that the exertion of the deceased in assisting to extinguish the fire did cause or was a contributing cause to the cerebral hemorrhage and to the death of the decedent.

### Conclusions of Law.

In the instant case the defendant, in my opinion, was guilty of negligence (1) in failing to use reasonable care to keep its right of way at or near the scene of the fire free of weeds, bushes, grass and other combustible material for months prior to the fire; (2) in maintaining and operating its engines so as to permit hot cinders to escape upon its uncleared right of way; (3) in failing to provide sufficient help to prevent the fire by removing or burning the weeds, grass, bushes and other combustible material from its right of way; (4) in failing to provide any fire-fighting apparatus or equipment for its section master and his crew. Keys v. Pennsylvania Railroad Co., 1940, 308 U.S. 529, 60 S.Ct. 385, 84 L.Ed. 447, reversing by memorandum opinion, the Court of Appeals for the Second Circuit, June 12, 1939, 104 F.2d 663.

However, it is my opinion that the decedent's death did not result in whole or in part from any of these acts of negligence. For me to say that the decedent's death resulted in whole or in part from these acts of negligence, or that the exertion by the deceased, as shown by the facts in this case, caused or contributed to the cerebral hemorrhage and consequently the death of the decedent, would, in my opinion, be mere conjecture and speculation.

For the foregoing reasons, appropriate judgment for the defendant should be entered, and

It Is So Ordered.